**Opinion issued December 23, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00971-CV

———————————

**PATRIOT CONTRACTING, LLC AND TRAVELERS CASUALTY & SURETY CO. OF AMERICA, Appellants**

**V.**

**SHELTER PRODUCTS, INC. AND KANCOR COMPANIES, LLC, Appellees**

---

**On Appeal from the 133rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-58350**

---

## O P I N I O N

Appellants, Patriot Contracting, LLC ("Patriot") and Travelers Casualty and Surety Company of America ("Travelers"), challenge the trial court's judgment, entered after a jury trial, in favor of appellees, Shelter Products, Inc. ("Shelter") and

Kancor Companies, LLC ("Kancor"), in Shelter's suit against Patriot, Travelers, and Kancor for breach of contract, suit on account, quantum meruit, promissory estoppel, unjust enrichment, violations of the Texas Construction Trust Fund Act[1] and the Texas Public Prompt Pay Act,[2] "[c]laim against [p]ayment [b]ond," and judicial foreclosure of a mechanic's and materialman's lien and in Kancor's suit against Patriot and Travelers for breach of contract, quantum meruit, unjust enrichment, promissory estoppel, a declaratory judgment, violations of the Texas Construction Trust Act, the Texas Public Prompt Pay Act, Texas Government Code Chapter 2251, and Texas Property Code Chapter 28, "[c]laim [a]gainst [p]ayment [b]ond," and judicial foreclosure of a mechanic's and materialman's lien. In ten issues, Patriot and Travelers contend that the trial court erred in entering judgment against them, Kancor and Shelter had an invalid Mary Carter agreement, the evidence was insufficient to support the jury's verdict, the trial court erred in instructing the jury, Kancor engaged in improper jury argument, the trial court erred in granting Shelter a directed verdict on its claim for judicial foreclosure of a mechanic's and materialman's lien, the trial court erred in awarding attorney's fees and pre-judgment interest, and the trial court erred in granting Kancor a declaratory judgment.

We affirm.

---

[1]     *See* TEX. PROP. CODE ANN. §§ 162.001–.033.

[2]     *See* TEX. GOV'T CODE ANN. §§ 2251.001–.055.

2

## Background

In its third amended petition, Shelter, a lumber, plywood, and materials distributor, alleged that it sold and delivered $213,679.29 worth of materials to Kancor which were used for "the construction of improvements for the real property known as Temenos Place II Apartments" (the "Temenos project"), a four-story apartment building for low-income residents funded by the City of Houston, Harris County, Texas and others. According to Shelter, it "furnished the [m]aterials to Kancor, a subcontractor on the [Temenos] [p]roject," which gave "the [m]aterials to Patriot, the [p]roject's general contractor" for use on the Temenos project. And, pursuant to the Texas Public Prompt Pay Act,[3] Travelers issued a bond for the Temenos project "to guarantee payment to subcontractors and suppliers who furnished labor or materials for the [p]roject." Shelter alleged that $213,679.29 "remain[ed] due and owing" for the materials it furnished for the Temenos project. Shelter sought to "enforce[e] payment of that sum by recovery on the [b]ond" or, "if there [wa]s no valid bond," "by foreclosure of a lien upon the land and improvements."

Shelter brought claims against Kancor for breach of contract, suit on account, quantum meruit, and promissory estoppel. Shelter brought a claim against Kancor

---

[3] *See* TEX. GOV'T CODE ANN. §§ 2251.001–.055.

and Patriot for unjust enrichment, alleging that Kancor and Patriot "acquired a benefit from receiving the [m]aterials from [Shelter] and using the [m]aterials on the [Temenos] [p]roject," at Shelter's expense. And Shelter brought a claim against Kancor and Patriot for violations of the Texas Construction Trust Fund Act,[4] alleging that when "Kancor and Patriot received partial payment on the . . . [Temenos] [p]roject, they did not pay [Shelter], although Kancor and Patriot knew that the bills were due and owing," and "Kancor and Patriot . . . misappropriated the funds they received on the [Temenos] [p]roject" to Shelter's detriment. Shelter also brought a claim against Patriot and Kancor for violations of the Texas Public Prompt Pay Act[5] because they had failed to pay the balance due to Shelter.[6]

Additionally, Shelter brought a claim against the payment bond issued by Travelers to release the mechanic's and materialman's lien that Shelter had filed against the Temenos project "for the purpose of enforcing payment" of the $213,679.29 owed to Shelter." And alternatively, Shelter sought judicial foreclosure of its mechanic's and materialman's lien on the Temenos project. Shelter requested damages in the amount of $213,670.29, attorney's fees under Texas Civil Practice

---

[4]     *See* TEX. PROP. CODE ANN. §§ 162.001–.033.

[5]     *See* TEX. GOV'T CODE ANN. §§ 2251.001–.055.

[6]     Shelter also sued Temenos Place II, LLC ("Temenos"), Ori Kantor, Kancor's principal, Joseph Collins, Kancor's Senior Operations Manager, and Sam Harrison, Patriot's project manager for the Temenos project. The claims against these defendants were dismissed, and they are not parties to the appeal.

4

and Remedies Code Chapter 38,[7] the Texas Construction Trust Fund Act,[8] the Texas Public Prompt Pay Act,[9] "and as otherwise allowed by law or contract," costs, and interest.

In response to Shelter's petition, Kancor, Patriot, and Travelers separately answered, generally denying the allegations in the petition, specifically denying certain allegations, and asserting various defenses.

Kancor then brought cross-claims against Patriot and Travelers. In its second amended cross-claim, Kancor alleged that Patriot "fail[ed] to honor its contractual obligations to Kancor." According to Kancor, it entered into a written contract with Patriot (the "Patriot-Kancor subcontract") for Kancor "to provide certain services, i.e., construction framing, and certain goods, i.e., lumber and framing materials, to Patriot for incorporation into the" Temenos project. Kancor alleged that it "performed as obligated" under the Patriot-Kancor subcontract, but Patriot refused to pay Kancor's "second and third payment applications" and "further refused to pay Kancor" for the "change order work" that it had performed. And because of Patriot's failure to pay Kancor, Kancor was "forced to stop all work on the Temenos [p]roject" and "to file a [mechanic's and materialman's] lien in the amount of $251,550.00,

---

[7] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001–.006.

[8] *See* TEX. PROP. CODE ANN. §§ 162.001–.033.

[9] *See* TEX. GOV'T CODE ANN. § 2251.043.

against the Temenos [p]roject." After Kancor filed the lien, "Patriot retained Travelers and Travelers issued an indemnity bond." Kancor submitted a claim to Travelers under the bond, but Travelers refused to pay.

Kancor brought cross-claims against Patriot for breach of contract, quantum meruit, unjust enrichment, and promissory estoppel. Kancor also brought a cross-claim against Patriot for violations of the Texas Construction Trust Fund Act,[10] the Texas Public Prompt Pay Act,[11] Texas Government Code Chapter 2251,[12] or alternatively, Texas Property Code Chapter 28.[13] And Kancor brought a declaratory judgment cross-claim against Patriot, seeking certain declarations.

As to Travelers, Kancor brought a cross-claim for "[c]laim [a]gainst [p]ayment [b]ond," "demanding that Travelers honor its obligation under the [payment] bond to pay [Kancor] for the reasonable value of its materials." And alternatively, Kancor sought judicial foreclosure of its mechanic's and materialman's lien on the Temenos project. Kancor sought damages in the amount of $251,550.00, attorney's fees under Texas Property Code sections 28.001 and 162.001, Texas Government Code Chapter 2251, "and as otherwise allowed by law or contract," costs, and interest.

---

[10]     *See* TEX. PROP. CODE ANN. §§ 162.001–.033.

[11]     *See* TEX. GOV'T CODE ANN. § 2251.043.

[12]     *See id.*

[13]     *See* TEX. PROP. CODE ANN. §§ 28.001–.010.

6

Patriot and Travelers separately answered Kancor's cross-claims, generally denying the allegations, specifically denying certain allegations, and asserting defenses.

Patriot then brought cross-claims against Kancor. In its third amended cross-claim, Patriot alleged that it and Kancor entered into the Patriot-Kancor subcontract under which Kancor agreed to provide framing services and framing materials for the Temenos project. According to Patriot, Kancor breached the Patriot-Kancor subcontract by "abandon[ing]" the framing work on the Temenos project. Patriot brought cross-claims against Kancor for violations of the Texas Public Prompt Pay Act[14] and Texas Construction Trust Fund Act,[15] subrogation of rights, and breach of contract. Patriot sought to recover from Kancor damages, attorney's fees, and interest.

In response to Patriot's third amended cross-claim, Kancor answered, generally denying the allegations, specifically denying certain allegations, and asserting defenses.

At trial, Aaron Wilson, Shelter's Vice President of Finance, testified that he oversees "financial aspects of the company," including the accounting department and the credit department. Wilson explained that to sell lumber on credit to a

---

[14]     *See* TEX. GOV'T CODE ANN. §§ 2251.001–.055.

[15]     *See* TEX. PROP. CODE ANN. §§ 162.001–.033.

contractor, like Kancor, Shelter requires "a credit application and . . . a job sheet" (the "credit agreement") that identify the "parties that are involved in the project" that "might have something to do with [Shelter's] ability to get paid." Related to the Temenos project, Shelter agreed to sell $420,955.00 in lumber to Kancor. On that project, Kancor was Shelter's customer, Patriot was the general contractor, and Temenos was the Temenos project's owner.

According to Wilson, Patriot signed a joint check agreement with Kancor and Shelter under which Patriot agreed to "make a good faith attempt" to "issue checks jointly made to [Kancor] and [Shelter] in accordance with progress payments made under the [Patriot-Kancor subcontract]." Wilson stated that the joint check agreement "[wa]s a way of ensuring that Shelter [was] paid for the material[s]" it supplied. Patriot made one payment with a joint check, which was for $82,450.00. Shelter gave Kancor credit for that payment. The $213,679.29 that Shelter sought in its suit was the balance that remained unpaid by Kancor after all the payments and credits were allowed.

Wilson explained that Shelter had a practice of invoicing customers monthly for the materials that it shipped to them. The invoices were for materials shipped between the eleventh of the prior month and the tenth of the current month and they stated that full payment was due by the twentieth of the following month. Shelter's credit agreement with Kancor followed this invoicing practice. Thus, Kancor was

8

not required to pay Shelter within seven days of receipt of payment, as Patriot was required to pay Kancor under the Patriot-Kancor subcontract.

Wilson also testified about Shelter's "aging report" for the materials it supplied to Kancor for the Temenos project, a copy of which was admitted into evidence at trial. That report showed the amount owed according to each invoice, the date the invoice was issued, and the date payment was due on the invoice. The report showed a total unpaid balance of $213,679.29, which was owed to Shelter by Kancor.

Wilson further explained that to collect on an overdue invoice, Shelter's credit department would first make a telephone call to the customer. If the call did not result in payment, Shelter would send mechanic's and materialman's lien notices to the parties identified in the credit agreement.

According to Wilson, Shelter sent such a notice to Patriot on June 11, 2014, stating that Kancor had not paid Shelter's invoices for materials used in the Temenos project. A "copy of the [June 11, 2014 lien] notice was also sent to [Temenos] and to [Kancor]." Shelter used a United Parcel Service tracking number to confirm that that the lien notices were received. Shelter sent another lien notice to Patriot on July 11, 2014, which was signed for by the recipient on July 14, 2014. And Shelter sent a third lien notice on August 20, 2014. The third lien notice stated that the amount owed to Shelter was $213,679.29, which was the same amount owed at time of trial.

9

Further, on September 8, 2014, Shelter sent lien notices to Temenos, Patriot, Travelers, and Kancor informing them that Shelter was owed $213,679.29 and would file a mechanic's and materialman's lien. On September 15, 2014, Shelter filed its "Affidavit Claiming Mechanic's and Materialman's Lien" with the Harris County District Clerk for recording in the real property records, and Shelter forwarded notice of that filing to Temenos, Patriot, Travelers, and Kancor.

Karen Vilhauer, a former credit specialist with Shelter, testified that her duties while employed by Shelter included "collections and sending out different lien release notices and notice[s] of non[-]payment," and she acknowledged that she had sent the lien notices on the amount owed to Shelter by Kancor on the Temenos project.

An excerpt from the deposition of Linda Green, Patriot's bookkeeper, was admitted into evidence at trial. In her deposition, Green testified that she received lien notices from Shelter in June, July, and August 2014. And in her testimony at trial, Green explained that Patriot paid Kancor "outside the [joint check] agreement" for the first two checks because she had not timely checked her voicemail messages and thus did not know that Kancor, Patriot, and Shelter had a joint check agreement until after the first two checks had been sent.

Jonathan LaFleur, Shelter's lumber trader, testified that Kancor agreed to pay Shelter $420,955.00 for the lumber that it needed for the Temenos project, but

Shelter did not supply all the lumber that Kancor had ordered because Kancor "was removed from the [Temenos project] job site" and Shelter was "not allowed to continue servicing the job." LaFleur explained that he acted as the "middleman" in having the joint check agreement between Patriot, Kancor, and Shelter signed, and he forwarded a copy of the signed agreement to Shelter's credit department. He stated that "[t]he purpose of [the] joint check agreement" was to ensure payment from Patriot to Shelter, "the material supplier," and to Kancor, "the framer."

LaFleur also explained that before Shelter became Kancor's supplier on the Temenos project, LaFleur was in contact with Jeff Jefferson, Patriot's Chief Executive Officer, about the project. Jefferson told LaFleur that Patriot had certain issues with the Temenos project budget based on the existing design plans. From discussions with Jefferson, LaFleur understood that "the lumber package" proposed for the Temenos project "was about $135,000[.00] too expensive." LaFleur and Jefferson "discuss[ed] options of how to bring the lumber package back in[to] . . . budget." These discussions included proposed design changes that would reduce the total cost of the lumber package. According to LaFleur, the proposed design changes included lowering the height of the first floor from eighteen feet to nine feet, which would require the framer to "put a band around each room and then place joists to create [the] ceiling." The proposed design changes also called for "removal of the double walls" that were in the original plans, which would result in

11

further savings. Another proposed design change "was to use trusses instead of [two-inch by twelve-inch lumber] for the floor joists."

Based on his discussions with Jefferson, LaFleur prepared a new materials list consistent with the proposed design changes. Shelter designed and fabricated the trusses for use in the Temenos project "with the proposed changes in mind." LaFleur had understood that Jefferson would have the plans altered to reflect the proposed design changes and to meet the requirements of the new materials list.

LaFleur explained that Kancor played no role in developing the proposed design changes that LaFleur discussed with Jefferson. After Shelter started shipping materials to Kancor using the new materials list, LaFleur visited the Temenos project job site. He looked at the plans that Patriot had given to Kancor and realized that Kancor was working from the original construction plans for the Temenos project, which did not contain any of the changes that LaFleur had recommended and that Jefferson had said would be incorporated.

According to LaFleur, the variance between the lumber that Shelter had supplied, which was based on the new materials list he had prepared, and the building being framed, which was based on the original plans, very quickly caused a lumber shortage on the Temenos project. When the shortage occurred, Kancor and Patriot began to have heated "back and forth" discussions because Jefferson, "who [had] directed all these changes, was staying on the sidelines, not saying anything."

On June 27, 2014, LaFleur sent an email to Kenneth "Sam" Harrison, Patriot's project manager for the Temenos project, Ori Kantor, Kancor's President, Collins, Kancor's Senior Operations Manager, and Jefferson to try to prompt "Jefferson to explain to everybody, yes, these changes [were] what [they were] doing." LaFleur stated in the email that Harrison had directed Kancor to frame the building for the Temenos project according to the original plans, which, due to the design changes, had become "worthless documents," and that Patriot needed to incorporate the design changes into the plans it provided to Kancor. And LaFleur noted that "Kancor had no control over the [plans] or the lumber list that Shelter was provided." Thus, Kancor was left to "build[] a building without the right . . . materials" or "the right budget numbers," which was causing "lots of difficult[ies]" with the Temenos project.

LaFleur stated that in early July 2014, when the $82,450.00 joint check from Patriot was "in [the] possession" of Shelter, Shelter delivered the remaining floor trusses to the Temenos project job site. LaFleur visited the job site again shortly before Kancor was removed from the Temenos project. At that time, Kancor had completed about sixty percent of the framing: it had framed the first and second floors and was "setting the sub floor on top for the third" floor.

An excerpt from the deposition of Harrison was admitted into evidence at trial. In his deposition, Harrison testified that, as Patriot's project manager for the

13

Temenos project, he was responsible for gathering payment applications from the various subcontractors and incorporating them into Patriot's payment applications to Temenos for the project. He also "schedul[ed] the [work on the Temenos project]" and "supervis[ed] the . . . subcontractors that [were] contracted to [Patriot]."

According to Harrison, Collins, Kancor's Senior Operations Manager, asked him for the strapping specifications[16] in mid-July 2014 because Kancor needed them to proceed with the framing. Harrison acknowledged that Kancor could not have proceeded with its work on the Temenos project without the strapping specifications. But Patriot did not receive the strapping specifications based on the design changes until September 11, 2014, almost two months after Patriot removed Kancor from the project. Yet, in his testimony at trial, Harrison stated that he told Collins that Kancor was responsible for providing the strapping for the project. Harrison also admitted in his deposition that even though Harrison told Temenos, the Temenos project owner, that Kancor was removed from the job for non-payment, Patriot had actually removed Kancor from the project because Patriot did not receive a timely answer to the City of Houston inspector's demands for the strapping specifications.

Harrison further explained that he understood that the Patriot-Kancor subcontract required Patriot to pay Kancor within seven days of Patriot's receipt of

---

[16] LaFleur testified that "[s]trapping holds the floor above to the floor below and overlaps . . . the cavity."

14

payment from Temenos. In Patriot's fifth payment application, Harrison asked Temenos to reimburse Patriot based in part on Kancor's second payment application, in which Patriot certified that Kancor's payroll was in compliance and should be paid. Harrison accepted the money from Temenos for Kancor's payroll. But Patriot did not pay Kancor in full for the labor and materials it supplied to the Temenos project. Harrison received an email from Collins on July 8, 2014 in which Collins notified him that Kancor still had not "received full payment from April" and that was why Kancor was not working on the project. By the time Collins sent the July 8, 2014 email, he had been "complaining for at least two weeks about not receiving payment from Patriot" for work performed by Kancor in April, and he had warned Patriot that Kancor would stop work unless it received payment. Yet Patriot did not pay Kancor even though Patriot had received payment from Temenos, and under the Patriot-Kancor subcontract, Patriot was supposed to pay within a certain amount of time. And Harrison was aware there was a bill due and owing to Kancor for its labor and materials in July 2014.

An excerpt from the deposition of George Johnson, the project manager for Temenos, was admitted into evidence at trial. In his deposition, Johnson testified about his dealings with Patriot during the Temenos project's construction. Either Steve Friedman, Patriot's owner, or Harrison would "threaten to pull off" the job "once every two weeks" for "a myriad of reasons," "[a]ny time they [we]re unhappy

15

about anything." Johnson would not describe the relationship he had with Patriot as a "working relationship." Friedman "would typically call" Johnson on his cellular telephone and "curse [Johnson] out until [Johnson] hung up."

Johnson also explained that Harrison had certified to Johnson that Patriot had paid its subcontractors for all the work for which Patriot had previously billed Temenos. Temenos paid Patriot in full on June 24, 2014 for the work documented on Kancor's first payment application. And with a check dated July 15, 2014, Temenos paid Patriot in full for the framing goods and services documented in Kancor's second payment application to Patriot, which was incorporated into Patriot's fifth payment application to Temenos. If Patriot did not pay Kancor for the work under Kancor's second payment application, then Harrison falsely certified that it had. Johnson received a July 14, 2014 email from Harrison informing him that Patriot was trying to convince Kancor to continue working on the Temenos project, but that Kancor was not willing to continue working on the project "due to non[-]payment." A week later, Johnson received another email from Harrison stating that "the issues [that Patriot] ha[d] with Kancor ha[d] already been disclosed, non[-]payment and safety issues relating to the strapping [specifications]." But neither of Harrison's emails informed Johnson that Patriot was not going to pay Kancor's second payment application, for which Temenos had already paid Patriot.

Collins, Kancor's Senior Operations Manager, testified that he worked with Kantor, Jefferson, and LaFleur to come to an agreement to frame the Temenos project. Kancor was "supposed to receive $747,350[.00]" under the Patriot-Kancor subcontract, but instead it received "around 250,000[.00]." Kancor completed "about half" of the Temenos project. Under the Patriot-Kancor subcontract, when Patriot "receive[d] the payment" from Temenos, it "ha[d] to [pay] Kancor within [seven] days of receipt of that" payment. According to Collins, that provision was important, because without "proper cash flow on a project you can't pay the labor, you can't pay the materials, and the project will stumble." Patriot did not honor that provision. It "paid [Kancor] extremely late and . . . and never in full." Shortly before Patriot removed Kancor from the Temenos project, Patriot "had asked [Kancor] to deliver another set of trusses and said" that when "the trusses were delivered, [Patriot] would make [Kancor] whole for the work [it had] done." Shelter provided the trusses, but payment in full "didn't happen."

Collins also testified that the Patriot-Kancor subcontract stated that "if there [wa]s an[] improper or wrongful termination then it w[ould] be converted into a termination under paragraph 8.3," which "essentially says that the contractor ha[d] to pay the subcontractor for the reasonable value of the subcontractor's work in place at the date of the termination." The reasonable value of the work and materials provided by Kancor was "[sixty], [seventy] percent of the contract value."

17

Collins further explained that "a joint check agreement is a pretty standard practice in this type of work." A joint check agreement "put[s] the liability of payment on the general contractor." At the end of each pay period, "the general contractor is supposed to call the supplier" and find out what invoices it has due. Then, the general contractor is supposed to take the "value [of] those invoices, subtract it from the subcontractor's pay[ment] app[lication], write a joint check naming the supplier and the subcontractor on [the] check, [and] send it to the subcontractor for endorsement," and "the subcontractor then sends [the check] to the supplier." Patriot "didn't do the processing" that Collins described; it "only sent one joint check" for $82,450.00, which was "definitely" less than the amount that Shelter was owed. Patriot had previously sent Kancor two other checks, which were both "applied to [Kancor's] first [payment] application." Kancor was owed $280,500.00 under its first payment application. Patriot paid Kancor all but the retainage (ten percent of that amount, or $28,050.00) that it was permitted to withhold temporarily under the Patriot-Kancor subcontract.[17] But Kancor "never paid" Shelter the full amount it was owed from the first payment application.

According to Collins, on June 24, 2014, Temenos paid Patriot in full for the work documented in Kancor's first payment application. But even though the

_____

[17] *See* TEX. PROP. CODE ANN. §§ 53.101–.105 (requiring owner to retain ten percent of "the contract price of the work" or ten percent of "the value of the work performed" for thirty days).

18

Patriot-Kancor subcontract required Patriot to pay Kancor within seven days of Patriot's receipt of payment from Temenos, Patriot did not pay Kancor until July 8, 2014. Collins considered Patriot's failure to pay Kancor within seven days of its receipt of payment from Temenos to be a breach of the Patriot-Kancor subcontract. And after the July 8, 2014 payment, Patriot made no further payments to Kancor.

Kancor suspended work on the Temenos project in July 2014 because Patriot had not provided Kancor with construction plans incorporating the design changes that Kancor needed to continue and had not paid Kancor. On July 14, 2014, Collins sent an email to Jefferson and Friedman informing them that he was visiting Shelter's office in Dallas, Texas to get the invoices for all the materials onsite at the Temenos project and then provide them to Patriot so that Shelter could be paid for those materials. He also asked about "the status of the design [plans]" that Kancor needed "to proceed." Collins told Jefferson and Friedman that Kancor had completed all the work it could do on the Temenos project up to that point. Its "crew [wa]s on standby waiting," and work was "at a standstill" until Patriot gave Kancor the updated design plans. Collins told Harrison that, under the circumstances, Kancor was authorized to stop work on the Temenos project, and it would return to work if Patriot paid Kancor and gave it the design plans it needed.

On July 15, 2014, Patriot received payment from Temenos on Patriot's fifth payment application, which included the funds documented in Kancor's second

19

payment application. On July 21, 2014, one day before Patriot was required to pay Kancor those funds under the Patriot-Kancor subcontract, Patriot sent Kancor a letter terminating it from the Temenos project.

Collins explained that Kancor did not pay Shelter for the Temenos project materials because Patriot did not pay Kancor. Shelter sought to recover $213,000.00 from Patriot. The difference between the amount that Shelter sought and the amount that Kancor sought was the amount of retainage Patriot owed Kancor from Kancor's first payment application. So, the amount Kancor sought to recover from Patriot was the money that Kancor owed Shelter plus the retainage.

Kancor made a demand on Patriot for the amount due. Kancor also asked Travelers to pay that amount. Collins executed Kancor's mechanic's and materialman's lien affidavit and claim. Patriot and Travelers were sent notices of the mechanic's and materialman's lien, and Kancor authorized the filing of the lien.

Kantor, Kancor's President, testified that while Kancor was working on the Temenos project, Collins told him that Patriot was not paying Kancor pursuant to the Patriot-Kancor subcontract and not providing "structural documents in a timely manner," including "truss engineering and designs," and that those problems were causing Kancor "a lot of stress on th[e] [Temenos] project." Kancor received about $252,000.00 for its work on the Temenos project, which was about one-third of the

Patriot-Kancor subcontract price, even though Kancor had completed about sixty percent of the framing work for the Temenos project.

Friedman, Patriot's President, testified that Patriot hired Kancor to do the framing work on the Temenos project but Kancor had "walked off the job." Friedman received a couple of telephone calls from Kantor while Kancor was still working on the Temenos project. Kantor told him that Kancor would not staff the job because it had not been paid. In early June 2014, Friedman paid Kancor "a hundred thousand dollars out of [Patriot's] money, before [Patriot] got paid, to keep the job going, because the [Temenos project] owner needed the building." And later, in June 2014, Friedman "gave" Kancor $70,000.00 more "to try to get [Kancor] to come back to the [Temenos project]." Friedman had assumed that Kancor would pay Shelter, but when he found out in July 2014 that Kancor had not paid Shelter, he "made a joint check to [Shelter] and to Kancor."

When Kancor did not return to the Temenos project, Friedman "terminate[d] [it], because [Patriot] had to get [the Temenos project] built." Patriot had to hire other workers to finish framing the building for the project. Those workers used the strapping specifications provided by the engineer, and "the City [of Houston] approved the work."

On cross-examination, Friedman acknowledged that he sent Kantor a September 2016 email in which he called Kantor "a trash mouth thug" and a

"worthless piece of shit" and warned Kantor that his "big, dumb, nasty thug mouth w[ould] not carry the day at trial."

At the close of the evidence, Shelter and Kancor moved for directed verdicts that the mechanic's and materialman's liens they filed substantially complied with the statutory requirements of the Texas Property Code. The trial court granted Shelter and Kancor directed verdicts in their favor, finding that their mechanic's and materialman's liens complied with the statutory requirements of the Texas Property Code as a matter of law and their liens were "valid." The trial court also directed a verdict against Patriot on its claim against Kancor for violations of the Texas Construction Trust Fund Act.

Shelter and Kancor also entered into two agreements about Shelter's claims against Kancor. In the first, a jointly filed "Agreed Stipulation of Facts and Law" (the "Agreed Stipulation"), entered before trial, Shelter and Kancor agreed that the Patriot-Kancor subcontract "describe[d] the scope of work for the Temenos Project, . . . part of which was subcontracted to Shelter whereby Shelter furnished materials for incorporation into the Temenos Project." Shelter provided materials and "issued invoices totaling $309,799.69, of which $213,679.29 [wa]s the liquidated remaining unpaid principal amount . . . ." Kancor and Shelter also stipulated to the three payments that they had received from Patriot, namely, the $100,000.00 and $70,000.00 checks issued by Patriot to Kancor and the $82,450.00

joint check issued by Patriot to Kancor and Shelter, all for payment of Kancor's first payment application. And they stipulated that "Kancor submitted two additional payment applications to Patriot," which included the labor provided by Kancor and the materials provided by Shelter, but Patriot refused to pay the two additional payment applications, forcing Kancor to stop work on the Temenos project.

As to Kancor's and Shelter's "[c]laim[s] against [p]ayment [b]ond" against Travelers, Kancor and Shelter stipulated that they mailed timely notice of their mechanic's and materialman's "lien and bond claim[s]" on the Temenos project "to the proper parties" and thereafter, timely recorded their mechanic's and materialman's lien affidavits and "gave timely notice thereof" to the proper parties.[18] The same day that they filed the Agreed Stipulation, Shelter amended its petition to state that Kancor and Shelter

> entered into an Agreed Stipulation whereby certain rights of Kancor were assigned to Shelter so that Shelter [could] prosecute those certain claims, including Prompt Pay Interest and attorney's fees under Chapter 28 of the Texas Property Code and Trust Fund under Chapter 162 of the Texas Property Code. The [Agreed] Stipulation [was] filed with the [trial] [c]ourt and should be enforced by the [c]ourt making presentation of questions of law and fact more simple.[19]

---

[18] The trial court approved the Agreed Stipulation on August 4, 2016.

[19] This language is included in Shelter's third amended petition—its live pleading at the time of trial.

23

Shortly before the trial court held its jury-charge conference, Shelter and Kancor filed a Rule 11 agreement[20] with the trial court, stating that "[Shelter] and [Kancor] agree[d] that in exchange for Kancor waiving any objection to Shelter's proposed jury [charge] questions 1–3, . . . Shelter w[ould] not seek to reduce the jury's verdict on such questions to judgment against Kancor (objective is to use to obtain recovery against bonds)." During the trial court's jury-charge conference, Kancor's counsel explained that Kancor and Shelter "ha[d] an agreement and an understanding that . . . [Shelter] need[ed] a factual finding from th[e] jury on the[] three questions . . . to perfect . . . a judgment in [Shelter's] favor against [Travelers]" under the payment bond applicable to Kancor's mechanic's and materialman's lien. Further, "[Shelter] need[ed] to be able to show [Travelers] that [t]here was a jury finding showing the underlying debt," so Kancor and Shelter had "entered into an agreement" to "waive any objection to those three [jury] questions."

As to Kancor's liability to Shelter, the jury found that Kancor agreed to pay Shelter for the materials provided by Shelter for the Temenos project but Kancor failed to do so and $213,679.29 would reasonably compensate Shelter for the materials furnished, but for which it was not paid. As to Patriot's liability to Kancor and Shelter, the jury found that Kancor furnished Patriot "labor and materials" for

---

[20]     *See* TEX. R. CIV. P. 11.

24

the Temenos project and that Kancor did not materially breach the Patriot-Kancor subcontract but Patriot did materially breach the Patriot-Kancor subcontract. And the jury found that $251.659.79 would reasonably compensate Kancor for damages resulting from Patriot's breach of the Patriot-Kancor subcontract.

The jury further found that Patriot failed to remit full payment for the "labor and materials" recorded on Kancor's first payment application "within seven (7) days of receipt, i.e., prior to July 1, 2015." And it found that Patriot also failed to remit full payment for the "labor and materials" recorded on Kancor's second payment application "within seven (7) days of receipt, i.e., prior to July 22, 2015," and it "failed to remit funds due and owing" under Kancor's second and third payment applications.

As to attorney's fees, the jury found that $230,268.59 was the amount of reasonable and necessary fees for Shelter's attorney through trial and that $55,000.00 was the amount of reasonable and necessary fees for Kancor's attorney through trial. It also found that Kancor was entitled to an additional $10,000.00 in attorney's fees to be incurred post-trial, and the jury made findings for attorney's fees related to Kancor's and Shelter's appellate representation if Patriot filed an unsuccessful appeal.

Consistent with the jury's verdict, the trial court, in its judgment, ordered that Shelter "have and recover judgment" "as a pass-through with [Kancor] against

[Patriot,] as principal[,] and [Travelers], as surety," on the payment bond and the indemnity bond, jointly and severally, for $213,679.29 "for materials sold and delivered on the Temenos [p]roject together with pre-judgment interest," attorney's fees of $230,268.59 under Texas Property Code section 53.156, and conditional appellate attorney's fees. And the trial court ordered that Kancor "have and recover judgment against [Patriot] and [Travelers], jointly and severally, in the principal amount of [$38,000.00], being the amount of Kancor's [mechanic's and materialman's] lien . . . less $213,679.29[,] the amount of Shelter's [mechanic's and materialman's] lien . . . as and against the payment bond."

The trial court also granted Kancor a declaratory judgment, declaring, in part, that:

a. The [Patriot-Kancor] subcontract required [Patriot] to submit [Kancor's] [p]ay[ment] [a]pplication to the [Temenos project] [o]wner[, Temenos,] for payment;

b. The [Patriot-Kancor] subcontract required [Patriot] to remit full payment for each of [Kancor]'s [p]ayment [a]pplications within seven (7) days of receipt of payment from [Temenos];

c. [Patriot] received full payment from [Temenos] for the labor and materials recorded on [Kancor's] Pay[ment] Application No. 1 on June 24, 2014;

d. [Patriot] failed to remit full payment for the labor and materials recorded on [Kancor]'s Pay[ment] Application No. 1 within seven (7) days of receipt, i.e., prior to July 1, 2014;

26

e.     [Patriot] received full payment from [Temenos] for the labor and materials recorded on [Kancor's] Pay[ment] Application No. 2 on June 15, 2014;

f.     [Patriot] failed to remit full payment for the labor and materials recorded on [Kancor's] Pay[ment] Application No. 2 within seven (7) days of receipt, i.e., prior to July to July 22, 2014; [and]

g.     [Patriot] ha[d] not remitted any funds due and owing under [Kancor]'s Pay[ment] Application since July 8, 2014[.]

(Emphasis omitted.)  And the trial court awarded Shelter and Kancor attorney's fees in the amounts found by the jury.

**Validity of Agreed Stipulation and Rule 11 Agreement**

In their first issue, Patriot and Travelers argue that the trial court erred in treating Shelter's and Kancor's Agreed Stipulation and Rule 11 agreement as valid agreements because they constituted a Mary Carter agreement prohibited by Texas law.  And, according to Patriot and Travelers, the trial court's purported error caused it to erroneously allow Shelter to present closing argument to the jury and submit questions to the jury for findings on Kancor's liability to Shelter.

A Mary Carter agreement exists when a plaintiff settles with one defendant and goes to trial against the remaining defendant, and the settling defendant, who remains a party, guarantees the plaintiff a minimum payment, which may be offset in whole or in part by an excess judgment recovered at trial.  *Elbaor v. Smith*, 845 S.W.2d 240, 247 (Tex. 1992); *Tex. Cap. Secs., Inc. v. Sandefer*, 58 S.W.3d 760, 768 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).  That type of settlement "creates

27

a tremendous incentive for the settling defendant to ensure that the plaintiff succeeds in obtaining a sizable recovery" and "motivates the defendant to assist greatly in the plaintiff's presentation of the case." *Elbaor*, 845 S.W.2d at 247. Mary Carter agreements are against public policy, and thus invalid, because they "skew the trial process, mislead the jury, promote unethical collusion among nominal adversaries, and create the likelihood that a less culpable defendant will be hit with the full judgment." *Id.*

When a plaintiff and a defendant enter into a Mary Carter agreement, courts presume that the shift in the settling defendant's position in relation to the other parties will alter the way it participates at trial. *Mi–Jack Prods., Inc. v. Braneff*, 827 S.W.2d 493, 499 (Tex. App.—Houston [1st Dist.] 1992, no writ). The failure to admit evidence of a Mary Carter agreement is reversible error because it denies the non-settling defendant the right to a trial by a jury that can fairly evaluate the evidence presented by the parties. *Sandefer*, 58 S.W.3d at 768. Informing the jury of the existence of the Mary Carter agreement is the only way to avoid a false impression of adversity and assure the jury is aware of the true interest of the parties. *Id.* Whether an agreement constitutes an impermissible Mary Carter agreement is an issue of contract interpretation, which we review de novo. *See, e.g.*, *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019).

We first note that the Agreed Stipulation and Rule 11 agreement did not guarantee Kancor any payment, and there was no agreement between Shelter and Kancor to give Kancor a financial interest in Shelter's recovery. *See Turner v. Monsanto Co.*, 717 S.W.2d 378, 380–81 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (explaining settlement agreement is not Mary Carter agreement unless settling defendant receives financial interest in plaintiff's recovery).

Nor did the Agreed Stipulation and Rule 11 agreement result in a misalignment of parties. Shelter sued Kancor to recover the money it was owed under their credit agreement for the materials that Shelter supplied for the Temenos project, making them nominal adversaries. But Shelter and Kancor had a common understanding of their rights and obligations under their credit agreement and its interplay with the Patriot-Kancor subcontract. And both Shelter and Kancor had claims against Patriot and Travelers.

Shelter's and Kancor's common interest in obtaining a recovery from Patriot and Travelers was made plain throughout the trial. In Kancor's opening statement to the jury, its trial counsel explained that the Patriot-Kancor subcontract was "supposed to work with [Shelter] providing lumber. [Shelter would] provide the lumber to Kancor; Kancor [would] provide[] the lumber to Patriot. Patriot then s[old] the lumber to Temenos. Temenos [would] pay[] Patriot, Patriot [would] pay[] Kancor, Kancor [would] pay[] Shelter. . . . [T]hat[] [was] the way it [was] supposed

to work." And "[s]o[,] what [Kancor was] really doing in this case" was trying to "get [Kancor] paid" so that Shelter "c[ould] get paid." Patriot's trial counsel also emphasized the alignment between Kancor and Shelter in his opening statement, remarking that they were "sitting right there together and they [we]re bound together."

The evidence adduced at trial was consistent with such descriptions of the Shelter-Kancor relationship. Collins, Kancor's Senior Operations Manager, testified that Kancor did not pay Shelter because Patriot did not pay Kancor. And he confirmed that Kancor sought to recover from Patriot the $213,000.00 that Kancor owed Shelter, plus the retainage that Patriot owed Kancor from Kancor's first payment application. Speaking for Shelter, LaFleur, Shelter's lumber trader, testified that Kancor's failure to pay Shelter was caused by Patriot's failure to pay Kancor. The payment applications that Kancor had submitted to Patriot, which were admitted into evidence at trial, also showed the amount that Kancor owed to Shelter.

In Shelter's closing argument to the jury, Shelter's trial counsel acknowledged that there was no dispute "that Kancor agreed to pay Shelter for the materials," and that Kancor and its witnesses told the jury that Kancor "owe[d] the money, [Kancor] bought the materials." Shelter's trial counsel also informed the jury that Shelter's mechanic's and materialman's lien was "included in [Kancor's] claim." And Kancor's trial counsel, in his closing argument, told the jury that Kancor "ha[d] been

30

fighting for five years to do one simple thing, get paid so [that Kancor] c[ould] pay Shelter. That's what th[e] fight [wa]s about."[21]

The trial court's charge to the jury also reflected the parties' alignment in a manner that was consistent with the evidence and argument presented during trial. Question Number 4 to the jury instructed that "Kancor's mechanic[']s and materialman's lien in the amount of $251,500[.00] [wa]s inclusive of Shelter's [mechanic's and] materialman's lien in the amount of $213,679.29 and [they] [we]re in compliance with the Texas Property Code." The jury questions asking for findings on Kancor's liability to Shelter were included in the charge not because of any contractual dispute between them, but because, as explained in the Rule 11

---

[21] Patriot and Travelers also argue that Shelter should not have been allowed to present closing argument to the jury because of the Agreed Stipulation and Rule 11 agreement. But the case Patriot relies on, *City of Houston v. Sam P. Wallace & Co.*, is inapposite. 585 S.W.2d 669 (Tex. 1979). There, the City of Houston (the "City") was one of two plaintiffs in the suit against Sam P. Wallace and Company ("Wallace"). *Id.* at 670. The City's individual co-plaintiff, Maurice Little, secretly reached a settlement with Wallace just before closing argument to the jury was made. *Id.* Little, the individual co-plaintiff, changed his position from trial by arguing in his closing that the City, and not Wallace, was at fault in causing the City's property damages and Little's personal injuries. *Id.* The Supreme Court condemned the decision to allow such a closing argument, remarking that Little's "counsel had no business making an argument to the jury at all," because after settling with Wallace, Little, the individual co-plaintiff, "had no further claim against anybody and no other party had any claim against him." *Id.* at 672. Here, in contrast, Shelter continued to have claims against Patriot and Travelers even with the Agreed Stipulation and Rule 11 agreement in place, so it was entitled to present closing argument to the jury.

agreement, the findings were necessary for Shelter to assert the lien rights assigned by Kancor against Travelers, an adverse party.

Because the Agreed Stipulation and Rule 11 agreement did not give Kancor a financial interest in Shelter's recovery and did not "create a false impression of adversity" between them, we conclude that the Agreed Stipulation and Rule 11 agreement do not constitute a prohibited Mary Carter agreement.[22] Thus, we hold that the trial court did not err in allowing Shelter to present closing argument to the jury and submitting questions to the jury for findings on Kancor's liability to Shelter.

We overrule Patriot's and Travelers' first issue.

---

[22] The final judgment declares that Shelter's recovery against Patriot is "as a liquidated pass-through claim against" Patriot as principal and Travelers as surety. Patriot and Travelers assert that the Agreed Stipulation and Rule 11 agreement do not constitute a pass-through claim as recognized in *Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605 (Tex. 2004). In that case, the Texas Supreme Court answered in the affirmative a certified question from the Fifth Circuit asking whether Texas law recognizes a pass-through claim that allows a contractor to assert a claim on behalf of its subcontractor against the owner despite the lack of privity of contract between the subcontractor and the owner. *Id.* at 610, 618. The Court distinguished pass-through claims from "certain assignments of claims," like Mary Carter agreements, "resulting in litigation between nominal adversaries that is purposely skewed to obtain a judgment against a common foe." *Id.* at 616. Here, because we have concluded that the Agreed Stipulation and Rule 11 agreement did not create the kinds of distortions and incentives that make Mary Carter agreements invalid, their validity does not depend on whether they constitute a pass-through claim. Thus, we do not address the portion of Patriot's and Traveler's argument related to pass-through claims. *See* TEX. R. APP. P. 47.1.

32

## Sufficiency of the Evidence

In their second and third issues, Patriot and Travelers argue that the trial court erred in entering judgment on the jury's finding that Kancor did not materially breach the Patriot-Kancor subcontract because the evidence conclusively proves a prior breach by Kancor, and they assert that the jury's finding that Patriot did materially breach the Patriot-Kancor subcontract is against the great weight and preponderance of the evidence.

Question Number 5 of the trial court's charge to the jury asked:

5.a. Did Kancor materially breach the [Patriot-Kancor] [sub]contract?

. . . .

Answer:     No[.]

5.b.    Did Patriot materially breach the [Patriot-Kancor] [sub]contract?

. . . .

Answer:     Yes[.]

According to Patriot and Travelers, Kancor materially breached the Patriot-Kancor subcontract as a matter of law "when it failed to pay Shelter" within seven days of receiving the $70,000.00 partial payment from Patriot.[23]  Patriot and

---

[23]    The seven-day payment requirement is also statutorily imposed.  Texas Property Code section 28.002(b) provides that

> [a] contractor who receives a payment . . . from an owner in connection with a contract to improve real property shall pay each of

33

Travelers assert that Kancor breached the Patriot-Kancor subcontract because "it is industry standard for subs to pay their suppliers when [they are] paid by the general contractor." But Patriot and Travelers do not cite to any legal authority supporting their assertion or identify any provision of the Patriot-Kancor subcontract which overrides the credit agreement between Kancor and Shelter. *See* TEX. R. APP. P. 38.1(i).[24] And that credit agreement did not have a "pay when paid" provision and

---

its subcontractors the portion of the owner's payment, including interest, if any, that is attributable to . . . materials suitably stored . . . as provided under the contract . . . to the extent of that subcontractor's interest in the owner's payment. The payment required by this subsection must be made not later than the seventh day after the date the contractor receives the owner's payment.

TEX. PROP. CODE ANN. § 28.002(b).

[24] Texas Rule of Appellate Procedure 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). "This is not done by merely uttering brief conclusory statements, unsupported by legal citations." *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *see also Barham v. Turner Constr. Co. of Tex.*, 803 S.W.2d 731, 740 (Tex. App.—Dallas 1990, writ denied) (appellant bears burden of discussing his assertions of error). A failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 255 (Tex. App.— Houston [1st Dist.] 2006, no pet.). To the extent that Patriot and Travelers argue that the trial court erred in entering judgment on the jury's finding that Kancor did not materially breach the Patriot-Kancor subcontract because the evidence conclusively proves that Kancor "failed to pay Shelter" within seven days of receiving payment from Patriot, we conclude that argument is waived due to inadequate briefing. *See* TEX. R. APP. P. 38.1.

thus did not require Kancor to pay Shelter within seven days of receiving payment from Patriot.

As to Patriot's challenge to the jury's finding that it materially breached the Patriot-Kancor subcontract, a complaint that a jury finding is "against the great weight and preponderance of the evidence" is "a complaint about factual sufficiency." *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 322 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see Dow Chem. Co. v. Francis*, 46 S.W.3d 240, 242 (Tex. 2001). When appellants attack the factual sufficiency of an adverse finding on an issue on which they did not have the burden of proof, they must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In conducting a factual-sufficiency review, we examine, consider, and weigh all the evidence in a neutral light and will reverse only if the evidence supporting the finding is so contrary to the overwhelming weight of the evidence as to make the judgment clearly wrong and manifestly unjust. *Dow Chem. Co.*, 46 S.W.3d at 242. The jury, as the fact finder, is the sole judge of the witnesses' credibility and may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Zenner v. Lone Star Striping & Paving L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

The Patriot-Kancor subcontract expressly required Patriot to remit payment to Kancor within seven days of Patriot's receipt of payment from Temenos. The evidence at trial showed that Patriot received payment from Temenos that included funds owed under Kancor's first payment application on June 24, 2014, but Patriot did not pay Kancor the funds owed under that application until July 8, 2014, seven days after it was due under the Patriot-Kancor subcontract. And Patriot wholly failed to pay Kancor the funds it received from Temenos for Kancor's second and third payment applications. Patriot's project manager for the Temenos project, Harrison, acknowledged, in his deposition testimony, which was admitted into evidence at trial, that, based on emails he had received from Collins, he knew that there was "a bill due and owing to Kancor for its labor and materials" in early July 2014.

Because the jury's finding that Patriot breached the Patriot-Kancor subcontract is not so contrary to the overwhelming weight of the evidence, we hold that the evidence is factually sufficient to support the jury's answer to Question Number 5.

We overrule Patriot's and Travelers' second and third issues.

**Improper Argument**

In their fourth issue, Patriot and Travelers argue that Kancor's trial counsel engaged in improper jury argument because counsel's cross-examination of Friedman, Patriot's President, contained statements that were "highly prejudicial"

36

and counsel's "language and questions influenced the jury to find against [Patriot and Travelers]." Patriot and Travelers assert that the improper jury argument constituted an "incurable error[] that ma[d]e mistrial the only appropriate remedy."

The portion of cross-examination of Friedman, about which Patriot and Travelers complain, is, as follows:

[Kancor's counsel:]    Mr. Friedman, you're kind of a difficult customer, aren't you?

[Friedman:]    No.

[Kancor's counsel:]    You have been described in this case as a bully, right?

[Friedman:]    Well, now let me answer that. I—

[Kancor's counsel:]    I didn't ask you whether you thought you were a bully, I said—

[Friedman:]    —that was one man's opinion—

. . . .

[Kancor's counsel:]    The question on the table is this, sir: You have been described in this case as acting like a bully, right?

[Friedman:]    I—I guess I heard that, yes.

[Kancor's counsel:]    You—in this case you have heard testimony where you threatened, you being [Patriot]—

[Friedman:]    Uh-huh.

[Kancor's counsel:]    —threatened to quit working on this project unless you got paid?

37

[Friedman:]    Yes, sir.

Patriot's and Travelers' trial counsel then interposed an objection "to th[e]se kinds of questions" on the ground that the information they sought was irrelevant. Kancor's trial counsel responded that "there's no legitimate basis for a breach of contract lawsuit against . . . Kantor[, Kancor's President,] or . . . Collins[, Kancor's Senior Operations Manager,]" individually, and that counsel was trying to show that "Friedman directed his attorney to sue them as a punitive measure." The trial court overruled the objection, and Kancor's trial counsel's cross-examination of Friedman continued:

| [Kancor's counsel:] | You have personally insulted . . . Kantor on multiple occasions, right, sir? |
|---|---|
| [Friedman:] | No. |
| . . . . | |
| [Kancor's counsel:] | The reason you instituted this lawsuit is because you have a personal, or are exercising a personal vendetta against [Kantor] and [Collins], right? |
| [Friedman:] | No. |

In their appellant's brief, Patriot and Travelers argue that they are entitled to reversal because this line of questioning of Friedman by Kancor's trial counsel improperly influenced the jury and was "highly prejudicial." But Patriot's and Travelers' objection at trial does not comport with their complaint on appeal.

38

*Compare* TEX. R. EVID. 402 (irrelevant evidence inadmissible), *with* TEX. R. EVID. 403 (relevant evidence may be inadmissible if "probative value is substantially outweighed by a danger of . . . unfair prejudice" or "misleading the jury").[25] To preserve its improper-jury-argument complaint for appeal, Patriot and Travelers were required to interpose the same objection in the trial court that they raise here. *See* TEX. R. APP. P. 33.1(a); *Benson v. Chalk*, 536 S.W.3d 886, 895–96 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("To preserve error for our review, an appellant's complaint on appeal must comport with [its] object in the trial court."); *Moran v. Mem'l Point Prop. Owners Ass'n*, 410 S.W.3d 397, 407 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Because Patriot's and Travelers' appellate complaint does not comport with the objection they raised to Kancor's counsel's cross-examination of Friedman at trial, we hold that their complaint has not been preserved for our review.[26] *See* TEX. R. APP. P. 33.1(a).

---

[25] To the extent Patriot's and Travelers' argument on appeal comports with their trial court objection on relevance grounds, it is waived because evidence of Friedman's animus toward Johnson, Collins, and Kantor was admitted at other times during the trial without objection. *See Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004) ("The general rule is error in the admission of testimony is deemed harmless and is waived if the objecting party . . . permits the same or similar evidence to be introduced without objection.").

[26] We also note that Patriot and Travelers failed to ask the trial court to instruct the jury to disregard the purportedly objectionable argument made by Kancor's trial counsel. *See Jones v. Rep. Waste Servs. of Tex., Ltd.*, 236 S.W.3d 390, 402 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). And, even if allowing that particular line of questioning by Kancor's counsel could not have been cured by instruction, as Patriot and Travelers assert, they were required to preserve the issue by raising it

## Jury Charge

In their fifth issue, Patriot and Travelers argue that the trial court erred in instructing the jury because the trial court failed to include their proposed jury instructions and question on their purported "defenses" asserted in the pleadings.

To preserve a complaint of jury-charge error, appellants must object to the jury charge in writing or on the record and obtain a ruling from the trial court, during the charge conference after the close of the evidence, but before the charge is read to the jury. TEX. R. CIV. P. 272; *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817, 829 (Tex. 2012). Appellants have preserved their complaint about error in the jury charge if they made the trial court aware of the complaint, timely and plainly, and obtained a ruling. *Cruz*, 364 S.W.3d at 829. "Our procedural rules state that a complaint to a jury charge is waived unless specifically included in an objection." *Id.* (citing TEX. R. CIV. P. 274; TEX. R. APP. P. 33.1(a)(1)); *see also Carter v. Treece*, No. 01-11-01003-CV, 2013 WL 3463681, at *1 (Tex. App.—Houston [1st Dist.] July 9, 2013, no pet.) (mem. op.) ("If a party fails to lodge an objection to the jury charge that timely and plainly makes the trial court aware of the complaint, error is not preserved and the complaint is waived on appeal."). If appellants assert that the

---

in their motion for new trial, which they likewise failed to do. *See* TEX. R. CIV. P. 324(b)(5); *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). For these reasons, Patriot and Travelers also did not preserve their improper-jury-argument complaint for appellate review. *See* TEX. R. APP. P. 33.1(a).

trial court improperly omitted an instruction or question in the court's charge, they must do more than object to preserve their complaint for appeal; appellants must request and tender to the trial court a substantially correct instruction or question in writing. TEX. R. CIV. P. 278; *Yellow Cab & Baggage Co. v. Green*, 277 S.W.2d 92, 93 (Tex. 1955); *Carter*, 2013 WL 3463681, at *2.

Patriot and Travelers tendered their proposed jury instructions and question on their "defenses" and obtained rulings from the trial court on them. Those instructions and question involve Kancor's conduct under its credit agreement with Shelter and asked whether some proportional payment was due to Shelter based on the partial payment that Patriot made to Kancor under the Patriot-Kancor subcontract.[27] Patriot and Travelers summarily urge that they "complied with the [Texas] Rule [of Civil Procedure] 278 requirement that [their] tender be in writing," and that their "tender [be] in substantially correct wording." (Internal quotations omitted.) But Patriot and Travelers do not explain why their requested instructions and question were reasonably necessary for the jury to render a proper verdict, and

---

[27] Patriot and Travelers asserted in their appellant's brief that

> Kancor materially breached [the credit agreement with Shelter], and that breach was the first material breach; that was the failure of Kancor to pay Shelter what was owed the supplier out of the original $170,000[.00] paid by Patriot to Kancor. The second material breach was that Kancor failed to provide Patriot a conditional release for the payment applications. The third material breach was when Kancor abandoned the Temenos project even though it had received payments in advance of its progress on the Temenos project.

Patriot's and Travelers' need for their submission is not apparent from the proposed instructions and question themselves. *See* TEX. R. CIV. P. 274. Further, Patriot and Travelers do not assert that the issues addressed in the jury instructions and question that they tendered to the trial court were not subsumed in the broad-form questions that the trial court did submit to the jury on Kancor's liability and damages owed to Shelter and on whether Patriot or Kancor first breached the Patriot-Kancor subcontract, and we conclude that they were. *See* TEX. R. CIV. P. 277 ("The court shall, whenever feasible, submit the cause upon broad-form questions."). As a result, we hold that the trial court did not err in refusing to submit to the jury Patriot's and Travelers' proposed jury instructions and question.

We overrule Patriot's and Travelers' fifth issue.

## Perfection of Liens

In their sixth and seventh issues, Patriot and Travelers argue that the trial court erred in granting Shelter a directed verdict on its claim for judicial foreclosure of a mechanic's and materialman's lien because Shelter's claim fails as a matter of law.[28]

---

[28] Patriot and Travelers do not challenge the trial court's directed verdict that Kancor substantially complied with the requirements for its mechanic's and materialman's lien and that Kancor assigned to Shelter its lien rights in the Agreed Stipulation, which was approved by the trial court. We nevertheless address this issue because the attorney's-fee award to Shelter depends on the validity of Shelter's own mechanic's and materialman's lien. *See* TEX. PROP. CODE ANN. § 53.156.

We review the trial court's grant of directed verdict de novo. *JPMorgan Chase Bank, N.A., v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018); *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). A trial court may direct a verdict in favor of a plaintiff on its cause of action only when the evidence conclusively proves a fact that establishes the plaintiff's right to judgment as a matter of law. *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Cox v. S. Garrett, L.L.C.*, 245 S.W.3d 574, 578 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see Domingo v. Skidmore*, No. 07-09-0392-CV, 2011 WL 4478385, at *4 (Tex. App.—Amarillo Aug. 21, 2011, no pet.) (mem. op.); *Kline v. O'Quinn*, 874 S.W.2d 776, 785 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *see also Smith v. Aqua–Flo, Inc.*, 23 S.W.3d 473, 476 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (directed verdict is appropriate when reasonable minds can draw only one conclusion from evidence). We determine whether any probative evidence exists to raise a fact issue on the questions presented. *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex. 1978); *Lemaster v. Top Level Printing Ink, Inc.*, 136 S.W.3d 745, 747 (Tex. App.—Dallas 2004, no pet.). We disregard all contrary evidence and inferences and give the opposing party the benefit of any reasonable inferences created by the evidence. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 234 (Tex. 2004); *Cox*, 245 S.W.3d at 578. If we conclude that any conflicting evidence of probative value raises a material fact issue, then the directed

43

verdict is improper because the issue is for the jury to resolve. *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

A mechanic's or materialman's lien is a statutory lien that attaches to real property to secure persons who have labored or provided material, machinery, fixtures, or tools to build or repair the improvements on that property. *Moore v. Brenham Ready Mix, Inc.*, 463 S.W.3d 109, 118 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *see generally* TEX. PROP. CODE ANN. §§ 53.001–.287. Mechanic's and materialmen's liens are protected by the Texas Constitution and are governed by specific statutes. *See* TEX. CONST. art. XVI, § 37; TEX. PROP. CODE ANN. §§ 53.051–.055.

Texas courts liberally construe the mechanic's and materialman's lien statutes to protect laborers and materialmen. *Hayek v. W. Steel Co.*, 478 S.W.2d 786, 795 (Tex. 1972); *Shojai v. Morrell Masonry Supply, Inc.*, No. 01-18-00204-CV, 2020 WL 5552622, at *3 (Tex. App.—Houston [1st Dist.] Sept. 17, 2020, pet. denied) (mem. op.). Thus, a party that has substantially complied with the requirements for perfecting a lien satisfies its statutory obligations. *LTF Real Estate Co. v. D & D Util. Supply, LLC*, No. 01-11-00244-CV, 2013 WL 1183300, at *3 (Tex. App.— Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.). Substantial compliance means compliance with the essential requirements of a statute and occurs when a party's deviation from strict compliance does not seriously impede the legislative

purpose of the statute. *See Sorrell v. Estate of Carlton*, 593 S.W.3d 167, 174 (Tex. 2019); *United Fire & Cas. Co. v. Boring & Tunneling Co. of Am.*, 321 S.W.3d 24, 28 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Texas Property Code Chapter 53 sets forth the procedures a subcontractor must follow to perfect a mechanic's and materialman's lien. TEX. PROP. CODE ANN. §§ 53.051–.055. Subsection 53.056(b) provides that a subcontractor with a lien claim

> must give to the original contractor written notice of the unpaid balance. The [subcontractor] must give the notice not later than the 15th day of the second month following each month in which all or part of the [subcontractor]'s labor was performed or material delivered. The [subcontractor] must give the same notice to the owner or reputed owner and the original contractor not later than the 15th day of the third month following each month in which all or part of the [subcontractor]'s labor was performed or material or specially fabricated material was delivered.

*Id.* § 53.056(b). The subcontractor may accomplish written notice either by (1) delivery of a writing in person; (2) certified mail; or (3) proving receipt of the notice (regardless of the method of delivery). *Id.* § 53.003(b), (c), (d). Delivery of "[a] copy of the statement or billing in the customary form" is sufficient to give notice of the debt. *Id.* § 53.056(f).

The evidence admitted at trial shows that Shelter sent four lien notices—on June 11, 2014, July 11, 2014, August 12, 2014, and September 8, 2014—and gave timely written notice to the statutorily required parties by an acceptable method. *See*

45

*id.* § 53.003(b), (c), (d); *see also id.* § 53.056(f); *Redland Ins. Co. v. Sw. Stainless*, 181 S.W.3d 509, 512 (Tex. App.—Fort Worth 2005, no pet.) (concluding mailing notices by first-class regular mail instead of by certified mail substantially complied with statute where employee testified that she placed the copies in mail on date of notice and that notices were not returned, and parties stipulated that two notices were actually received). Shelter sent the June, July, and August 2014 notices to Temenos, Patriot, and Kancor, and it sent the September 2014 notice to Temenos, Patriot, Kancor, and Travelers. The June 11, 2014 notice was hand-delivered to Patriot. Shelter sent the July 11, 2014 notice to Temenos by hand delivery and sent copies to Patriot and Kancor by first-class mail. Shelter also sent Temenos and Patriot an email on July 24, 2014 that contained all its unpaid invoices and a statement listing the unpaid invoices for materials by date and amount. Shelter hand-delivered the August 12, 2014 notice to Temenos and sent it by first-class mail to Patriot and Kancor. In her deposition testimony, admitted into evidence at trial, Green, Patriot's bookkeeper, acknowledged that she received the lien notices from Shelter in June, July, and August 2014, and she testified that she received Shelter's July 2014 email.

Shelter's fourth lien notice was sent on September 8, 2014 by certified mail to Temenos, Patriot, Kancor, and Travelers. Pertinent here, Texas Property Code section 53.205 allows a party to perfect a lien either "in the manner prescribed for fixing a lien under Subchapter C" or "in the manner prescribed by [Texas Property

46

Code] [s]ection 53.206." *See id.* § 53.205(a); *see id.* § 53.056. Shelter used the same method in delivering notice to Travelers that it used in delivering its prior notices to Temenos, Patriot, and Kancor, as permitted by section 53.205(a). *See id.* § 53.205(a)(1).

Although Patriot and Travelers complain about the differences in the amounts stated in Shelter's mechanic's and materialman's lien notices from month to month, Shelter properly relied on its credit agreement with Kancor in calculating the amount that remained unpaid for each month's notice, which accounts for the differences among the notices. And each month's notice included the unpaid invoices and informed each of the recipients of the same amount that had not been paid. A subcontractor strictly following Texas Property Code section 53.056(b) would send a lien notice to the general contractor in the second month and, if no payment is made, the subcontractor would send the same notice to the owner in the third month. *See id.* § 53.056(b). But nothing in the statute prevents the subcontractor from combining two monthly notices into one and mailing notice of non-payment by the second month at the same time to all parties requiring notice. The purpose of requiring a lien affiant to give actual notice of the lien to the property owner is to "ensure[] that a property owner will not be ambushed by recorded liens of which [it] is unaware." *Truss World v. ERJS*, 284 S.W.3d 393, 396 (Tex. App.—Beaumont 2009, pet. denied). The record shows that Temenos received all of Shelter's

47

mechanic's and materialman's lien notices[29] and actual receipt of the lien notices by Patriot's agent. We conclude Shelter substantially complied with the statutory notice requirements. *See id.*; *Arias v. Brookstone*, 265 S.W.3d 459, 464 (Tex. App.— Houston [1st Dist.] 2007, pet. denied) ("Because the person executing the lien affidavit must file the affidavit by the relatively short deadlines stated in [Texas] Property Code sections 53.052 and 53.056 . . . , the owner and original contractor can hardly claim to be hurt when they are notified in advance of the actual filing of the lien affidavit.").

Patriot and Travelers also complain that Shelter's mechanic's and materialman's lien affidavit contained various technical deficiencies. A person claiming a lien must file an affidavit with the county clerk that contains:

(1) a sworn statement of the amount of the claim;

(2) the name and last known address of the owner or reputed owner;

(3) a general statement of the kind of work done and materials furnished by the claimant and, for a claimant other than an original contractor, a statement of each month in which the work was done and materials furnished for which payment is requested;

(4) the name and last known address of the person by whom the claimant was employed or to whom the claimant furnished the materials or labor;

(5) the name and last known address of the original contractor;

---

[29] The trial court took judicial notice of Temenos's answers to Shelter's request for admissions, in which Temenos admitted that it received all of Shelter's mechanic's and materialman's lien notices.

48

(6) a description, legally sufficient for identification, of the property sought to be charged with the lien;

(7) the claimant's name, mailing address, and, if different, physical address; and

(8) for a claimant other than an original contractor, a statement identifying the date each notice of the claim was sent to the owner and the method by which the notice was sent.

TEX. PROP. CODE ANN. § 53.054(a); *see also id.* § 53.052. Patriot and Travelers assert that Shelter's affidavit contains errors including: (1) failing to state the last known address of the original contractor, i.e., Patriot; (2) generally stating that Shelter "sent notices to the reputed owner(s) by certified mail, return receipt requ[ested] on at least August 27, 2014," where the notices were sent June 11, 2014, July 11, 2014, and August 12, 2014, and not all by certified mail; (3) reciting "State of Texas, County of Harris" at the beginning of the affidavit, but later stating that the affiant appeared before a notary public "in and for the State of Oregon," and the affidavit was notarized by that notary public in Oregon; (4) stating that the debt incurred arose from an oral agreement rather than a written contract; (5) failing to state a date of delivery for the attached invoices; and (6) stating an amount due—the same amount that Shelter recovered at trial—which was different than the total amount in the attached invoices. But Patriot and Travelers do not suggest that they were misled or prevented from having timely notice of the mechanic's and materialman's lien by any of these technical defects, and there is no dispute that

49

Temenos, the property owner, timely received pre-lien notice. *See Mustang Tractor & Equip. Co. v. Hartford Accident & Indem. Co.*, 263 S.W.3d 437, 442 (Tex. App.—Austin 2008, pet. denied).

We conclude that the trial court properly found that Shelter's mechanic's and materialman's lien notices and affidavit substantially complied with the statutory requirements. Thus, we hold that the trial court did not err in granting a directed verdict in favor of Shelter on its claim for judicial foreclosure of a mechanic's and materialman's lien.

We overrule Patriot's and Travelers' sixth and seventh issues.

**Attorney's Fees**

In their eighth issue, Patriot and Travelers argue that the trial court erred in awarding Kancor and Shelter their attorney's fees under Texas Property Code section 53.156 because their pleadings were insufficient to support the award, they "failed to properly segregate their recoverable fees from their nonrecoverable fees," and they failed to apply the "lodestar" analysis to show sufficient evidence of the reasonableness and necessity of the fees.

Generally, litigants are responsible for their own attorney's fees unless an award is authorized by statute or contract. *See Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 41 (Tex. 2012); *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex. 2009). Because a trial court's judgment must conform

50

to the pleadings, a party seeking attorney's fees must plead for them, specifying the legal standard under which the fees are sought. *See Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 659 (Tex. 2009) (holding party waived its right to recover attorney's fees under contractual provision by pleading for attorney's fees only under statutory provision); *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 61–62 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding party could not recover attorney's fees under contractual provision when it pleaded for attorney's fees only under statutory provision).

Patriot first argues that Kancor and Shelter are not entitled to recover their attorney's fees because neither expressly invoked Texas Property Code section 53.156 as a ground for the recovery of their attorney's fees in their pleadings. "Texas follows a 'fair notice' standard for pleading, which looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896–97 (Tex. 2000); *Commerce & Indus. Ins. Co. v. Ferguson-Stewart*, 339 S.W.3d 744, 748 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Where, as here, no special exceptions have been sustained, we construe pleadings liberally in favor of the pleading party. *Horizon/CMS Healthcare Corp.*, 34 S.W.3d at 897; *Commerce & Indus. Ins. Co.*, 339 S.W.3d at 748.

51

Both Kancor and Shelter pleaded claims for recovery pursuant to the payment bond and, alternatively, sought judicial foreclosure of their mechanic's and materialman's lien pursuant to Texas Property Code Chapter 53. And both pleaded for attorney's fees as authorized by law. Those pleadings provided fair notice that Kancor and Shelter sought attorney's fees under Texas Property Code section 53.156. If a party that pleads facts which, if true, entitle it to the relief sought, the party need not specifically plead the applicable statute to recover attorney's fees under it. *Whallon v. City of Houston*, 462 S.W.3d 146, 165 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *see Mitchell v. LaFlamme*, 60 S.W.3d 123, 130 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Thus, we hold that Kancor's and Shelter's pleadings support their respective awards of attorney's fees under Texas Property Code section 53.156.

Patriot and Travelers also argue that the attorney's-fee awards are improper because Kancor and Shelter failed to segregate their recoverable fees from their non-recoverable fees and failed to adduce sufficient evidence under the "[l]odestar requirement" to support the attorneys' fees awards. (Internal quotations omitted.) "[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). Whether attorney's fees should be segregated is a question of law, and the extent to which

52

certain claims can or cannot be segregated is a mixed question of law and fact. *Id.* at 312–13; *CA Partners v. Spears*, 274 S.W.3d 51, 81 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

"Intertwined facts do not make [certain] fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Chapa*, 212 S.W.3d at 313–14. But where segregation is required, attorneys are not required to "keep separate time records when[, for instance,] they drafted the fraud, contract, or DTPA paragraphs of [a] petition." *Id.* at 314. "[A]n opinion w[ill] . . . suffice[] stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim." *Id.*; *see Young v. Dimension Homes, Inc.*, No. 01-14-00331-CV, 2016 WL 4536407, at *10 (Tex. App.—Houston [1st Dist.] Aug. 30, 2016, no pet.) (mem. op.); *see also 7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 506 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). But if a party does not properly segregate its attorney's fees between recoverable and non-recoverable claims and we determine segregation is required, we must reverse the fee award and remand the matter for the trial court to determine which fees are recoverable. *Chapa*, 212 S.W.3d at 314; *Young*, 2016 WL 4536407, at *10.

As to Patriot's and Travelers' complaint that Shelter and Kancor failed to adduce sufficient evidence under the "[l]odestar requirement" to support their attorney's-fees awards, we note that the lodestar analysis applies when a party seeks recovery of attorney's fees under any fee-shifting statute. *Rohrmoos Venture v. UTSW DVA Healthcare*, 578 S.W.3d 469, 496 (Tex. 2019). The lodestar method was developed as a "short hand version" of the factors set forth in *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812 (Tex. 1997).[30] *Rohrmoos*, 578 S.W.3d at 496 (internal quotations omitted). Although the lodestar method was

---

[30] Those factors include:

> (1)  the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
>
> (2)  the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3)  the fee customarily charged in the locality for similar legal services;
>
> (4)  the amount involved and the results obtained;
>
> (5)  the time limitations imposed by the client or by the circumstances;
>
> (6)  the nature and length of the professional relationship with the client;
>
> (7)  the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8)  whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (alteration in original).

"never intended to be a separate test or method," it is a "focused and objective analysis of whether the fees sought are reasonable and necessary." *Id.* The calculation "yield[s] a base figure that reflects most *Arthur Andersen* factors and is thus presumptively reasonable." *Id.* But the figure is subject to adjustment if the presumption is overcome by other *Arthur Andersen* factors not accounted for in the base lodestar figure. *Id.*

Under a lodestar analysis, the determination of what constitutes reasonable attorney's fees involves two steps. *Id.* at 494; *Iola Barker v. Hurst*, 632 S.W.3d 175, 186 (Tex. App.—Houston [1st Dist.] 2021, no pet.). Under the first step, the fact finder determines the reasonable hours that counsel worked on the case and the reasonable hourly rate for such work. *Rohrmoos*, 578 S.W.3d at 498. The fact finder then multiplies the number of hours worked by the applicable rate. *Id.* There is a presumption that the base lodestar calculation, when supported by sufficient evidence, reflects the reasonable and necessary attorney's fees. *Id.* at 499. The party seeking its attorney's fees bears the burden of providing sufficient evidence. *Id.* at 498. This includes evidence of (1) the particular services performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *Id.*

55

Contemporaneous billing records are not required to prove that the requested fees are reasonable. *Id.* at 502. However, "[g]eneral, conclusory testimony devoid of any real substance will not support a fee award." *Id.* at 501. Generalities about tasks performed provide insufficient information for the fact finder to meaningfully review whether the tasks and hours were reasonable and necessary. *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012). There must be some evidence about the time spent on specific tasks to enable the fact finder to meaningfully review the requested fees. *Long v. Griffin*, 442 S.W.3d 253, 255 (Tex. 2014).

Shelter's attorney, Ben Aderholt, testified that he had represented Shelter in this litigation for five years. He told the jury about the depth of his experience in construction law and litigation, the discovery conducted in the case, and how his law firm staffed the case. Aderholt explained that he had discounted the legal fees charged to Shelter by about $90,000.00, and that in his expert opinion, it was "necessary and reasonable to spend $207,120.50 in the prosecution of the case." And he pointed out that that amount did not include the fourteen hours he and his firm spent "on the trust fund claims and the Temenos claims" that were no longer in the case. Aderholt testified to costs of $23,118.09, and he explained that Shelter incurred expenses for flights to Oregon and Florida and for the court reporter in taking eight depositions. The necessary and reasonable fees and expenses testified to by Aderholt totaled $230,268.59, the sum found by the jury.

Shelter's evidence of attorney's fees also included documents admitted into evidence at trial, such as the correspondence sent by Aderholt at the beginning of the dispute as well as the itemized monthly invoices sent to Shelter by Aderholt and his law firm for legal services and expenses for the period from August 2014 through May 2019. And it included a summary sheet detailing a reduction of both attorney's fees and expenses after amounts were segregated for claims not pursued by Shelter.

Kancor's attorney, Mark Counts, testified to his professional experience and told the jury that, as a sole practitioner, he had represented Kancor as lead counsel since the summer of 2014. He explained that he had "either personally rendered or supervised all services on the file." He testified about his hourly billing rate and stated that, in computing the attorney's fees charged in the case, he considered the "[t]ime and labor required; the difficulty and novelty of the questions involved; the likelihood that acceptance of other employment would preclude this engagement; the fees customarily charged in the locality; the amount involved; the time limitations imposed by [Kancor] or the circumstances; the nature and length of the professional relationship; the experience, reputation, and ability of the other lawyers." The hourly rate that Counts charged in this case, which was approved by Kancor, "[wa]s within" or below "the range customarily charged within Harris County" at that time. Counts reviewed his firm's itemized billing records, which were admitted into evidence at trial. He stated that he had discounted the attorney's

fees charged as he reviewed the monthly invoices to be sent to Kancor but could not say exactly by how much. In any event, he opined that "all the work [he] performed was both reasonable and necessary in rendering the services" to Kancor in the case. Counts further stated that the recoverable amount of Kancor's attorney's fees was $55,069.33 for the claims "asserted on affirmative relief," out of a total amount of $83,437.93 in attorney's fees expended on the case. The jury found that $55,000.00 was a "reasonable fee for the necessary services" of Kancor's counsel.

The attorneys representing Shelter and Kancor each testified to their unsegregated attorney's fees and their opinion as to the portion of time expended on claims for which fees were recoverable. And their testimony and itemized invoices admitted into evidence showed the legal services performed, the attorney or staff person who performed those services, when they were performed, and the amount of time required to perform them, as well as the hourly rate for each person performing them. The attorneys both opined as to the reasonableness and necessity of the attorney's fees and expenses incurred by their clients. The itemized invoices and the attorneys' testimony concerning the attorney's fees charged, work performed, and the portion of the time expended on claims for which attorney's fees were recoverable were some evidence in support of the awards, and we conclude that there was sufficient evidence to support the trial court's award of attorney's fees to Shelter and Kancor. *See McMahon v. Zimmerman*, 433 S.W.3d 680, 694 (Tex.

58

App.—Houston [1st Dist.] 2014, no pet.). Accordingly, we hold that the trial court did not err in awarding Kancor and Shelter attorney's fees under Texas Property Code section 53.156 in the amounts found by the jury.

We overrule Patriot's and Travelers' eighth issue.

## Pre-Judgment Interest

In their ninth issue, Patriot and Travelers argue that the trial court erred awarding Shelter and Kancor pre-judgment interest calculated at an eighteen percent rate—the rate of interest applied to late payments under the Shelter's credit agreement with Kancor—because the trial court should have calculated pre-judgment interest based on "general Texas pre-judgment interest law."

"Pre[-]judgment interest is compensation allowed by law as additional damages for lost use of money due as damages during the lapse of time between the accrual of the claim and the date of judgment." *Ventling v. Johnson*, 466 S.W.3d 143, 153 (Tex. 2015) (internal quotations omitted). Texas law provides two legal sources for pre-judgment interest: (1) general principles of equity and (2) enabling statutes. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998). When no statute controls, an award of pre-judgment interest is governed by equitable principles, and the decision to award pre-judgment interest falls within the trial court's discretion. *Trevino v. City of Pearland*, 531 S.W.3d 290,

59

297–98 (Tex. App.—Houston [14th Dist.] 2017, no pet.). We review the trial court's award of pre-judgment interest for an abuse of discretion. *Id.* at 298.

Patriot argues that the trial court erred in calculating the pre-judgment interest because although "Kancor might owe interest to Shelter at [eighteen percent] per year," based on the credit agreement, "Patriot and Travelers d[id] not."[31] This position disregards the obligations assumed in executing the payment bond. *See* TEX. PROP. CODE ANN. §§ 53.171(c), 53.202. The payment bond was required to "be conditioned substantially that the principal and sureties w[ould] pay to the named obligees or to their assignees the amount that the named obligees would . . . be[] entitled to recover if their claims had been proved to be valid and enforceable liens on the property." *Id.* § 53.172(6). Kancor's claims arising from Patriot's failure to pay Kancor's second and third payment applications include both the principal and accrued interest Kancor owed to Shelter under the credit agreement, thus Patriot's and Travelers' argument must fail.

We hold that the trial court did not err in awarding pre-judgment interest at the eighteen percent rate on the amount owed to Shelter by Kancor under the credit agreement.

We overrule Patriot's ninth issue.

---

[31]    In the credit agreement, Shelter and Kancor agreed that Kancor would pay one and one-half percent interest per month on unpaid invoices for materials furnished for the Temenos project, together with costs and attorney's fees.

## Declaratory Judgment

In their tenth issue, Patriot and Travelers argue that the trial court erred in granting Kancor a declaratory judgment because the declarations included in the trial court's judgment provided "no greater ramifications than the original suit," making declaratory relief improper.[32] *See BHP Petroleum Co., Inc. v. Millard*, 800 S.W.2d 838, 842 (Tex. 1990).

Generally, the plaintiff bears the burden to obtain affirmative answers to jury questions as to the necessary elements of its cause of action. *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 481 (Tex. 2017); *Cho v. Kim*, 572 S.W.3d 783, 798 (Tex. App.—Houston [14th Dist.] 2019, no pet.). The declaratory judgment awarded to Kancor defines Kancor's rights under the Patriot-Kancor subcontract and thus clarifies Kancor's claims arising under that subcontract that serve as the basis for its recovery pursuant to the mechanic's and materialman's lien. We hold that the trial court did not err in granting Kancor a declaratory judgment.

We overrule Patriot's and Travelers' tenth issue.

---

[32] Kancor argues that Patriot and Travelers failed to preserve this complaint for appellate review because they did not specially except to Kancor's claim for declaratory relief raised in Kancor's pleadings or object to Kancor's proposed jury questions on its declaratory-judgment claim submitted to the jury in the trial court's charge. But Patriot's and Travelers' complaint is essentially that the jury's answers to the declaratory-relief questions in the jury charge are immaterial, which is not the same as a jury-charge complaint. *See Musallam v. Ali*, 560 S.W.3d 636, 640 (Tex. 2018). Thus, we disagree that Patriot and Travelers have failed to preserve their complaint for our review.

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Justices Countiss, Rivas-Molloy, and Guerra.